IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-00135-PAB-KLM

AMEC EARTH AND ENVIRONMENTAL, INC.,

    Plaintiff,

v.

SOLSOURCE ENERGY SOLUTIONS, LLC, and
JEFFREY R. SCOTT,

    Defendants.

---

**ORDER**

---

This matter is before the Court on Defendants' Amended Motion to Dismiss AMEC's Second, Fourth, and Fifth Claims for Relief [Docket No. 33] filed by defendants SolSource Energy Solutions, LLC[1] and Jeffrey R. Scott. Because default has entered against defendant SolSource, the Court will consider the motion to dismiss in regard to defendant Scott only.[2] The motion is fully briefed and ripe for disposition.

---

[1] On August 10, 2011, the Court issued an Order allowing defense counsel to withdraw from representing SolSource [Docket No. 37]. Because SolSource, as a company, could not proceed *pro se*, *see Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 556 (10th Cir. 2001), the Court ordered SolSource to show cause why default should not enter for its failure to retain new counsel [Docket No. 43]. SolSource failed to respond to the Order to Show Cause. Accordingly, the Court directed the clerk of the court to enter default [Docket No. 44] and on September 20, 2011, default entered against SolSource [Docket No. 47].

[2] Mr. Scott is the president of SolSource. Docket No. 1 at 1, ¶ 3. Although Mr. Scott now appears as a *pro se* litigant, at the time of this response he was represented by counsel. Therefore, the Court will not apply a different standard of review to Mr. Scott's response.

## I. BACKGROUND

On June 26, 2009, AMEC Earth and Environmental, Inc. contracted with the Department of the Air Force, Air Education and Training Command (the "Air Force") to build a 1.0 Mega-Watt Solar Photovoltaic array (the "PV array").[3] Docket No. 1 at 3, ¶ 10. On July 21, 2009, AMEC and SolSource entered into a subcontract under which SolSource agreed to provide all labor, materials, equipment and supervision necessary to build the PV array. *Id*. at ¶ 12. SolSource contracted to build the PV array in accordance with Air Force standards and to correct or replace any deficient work after the approval of the final payment, but prior to the expiration of one year after acceptance. *See id.* at 3-4, ¶¶ 13-14. The subcontract also contained an express warranty and a defective work clause wherein SolSource would: (1) perform all work according to accepted industry practice reflecting SolSource's best professional knowledge and judgment; (2) incur all expenses to re-perform or procure work AMEC deemed inadequate or insufficient; (3) pay all costs of any correction needed, including compensation for additional professional services; and (4) pay for all direct and indirect costs of removing and replacing defective or rejected work. Docket No. 13-1 at 10-11.

According to AMEC, SolSource failed to adhere to the terms of the subcontract and materially breached the agreement when it: (1) assembled the foundation of the PV array with structural deficiencies; (2) completed only 60% of the PV array's electrical system; (3) installed defective wiring resulting in an electrical fire; and (4) failed to

---

[3]A photovoltaic device, also known as a solar cell, converts a light source into an electrical current. *See generally* David Redfield, *Photovoltaics: An Overview,* 3 Solar L. Rep. 217, 218-19 (1981). A photovoltaic array is a series of connected photovoltaic devices. *Id*.

compensate lower tier subcontractors despite receiving timely invoice payments. *Id*. at 15-18.

### A. Foundation Deficiencies

AMEC alleges that SolSource agreed to construct a PV array able to withstand 120 mile per hour winds and support a snow load of 40 pounds per square foot. Docket No. 1 at 4, ¶ 16. Additionally, SolSource promised to use vertical and battered piers to construct the foundation supports. *Id*. at ¶ 15. The subcontract also permitted SolSource to issue subcontracts with AMEC's prior written consent. Docket No. 13-1 at 3, ¶ 12.

To complete construction of the foundation, SolSource entered into subcontract agreements with D&B Drilling, Inc.,[4] Advanced Piping and Fabrication, LLC ("Advanced Piping"), and AZ-Tec Erectors, Inc. ("AZ-Tec"). Docket No. 1 at 5, ¶¶ 18-24. Once construction began, AMEC notified SolSource that the PV array showed signs of significant structural problems. *Id*. at 6, ¶ 26. Specifically, the PV array exhibited excessive movement and appeared out of alignment. *Id*. at ¶ 28. On May 24, 2010, AMEC issued a corrective action request demanding that SolSource remedy the problems associated with the PV array. *Id*. at ¶ 27. In June 2010, AMEC and the Air Force also requested information regarding the PV array's engineering design and met with SolSource to develop a solution for the structural problems. *Id*. at ¶ 30.

AMEC asserts that between June 3, 2010 and August 17, 2010 it gave SolSource several requests to cure, yet SolSource did not repair the identified structural

---

[4]The subcontract with D&B Drilling, Inc. was completed without AMEC's prior input or approval. Docket No. 1 at 5, ¶ 18.

deficiencies. *Id*. at 6-7, ¶¶ 31-34. AMEC further alleges that, despite holding negotiations between the parties on September 2, 2010, the two sides were unable to reach an agreement. *Id*. at ¶ 38. On September 20, 2010, AMEC terminated the subcontract with SolSource, alleging a material breach of the contract since the PV array was unable to withstand strong winds because of structural deficiencies, SolSource used only vertical piers and not battered piers to construct the foundation, and SolSource subcontracted with D&B Drilling without AMEC's input or approval. *Id*. at ¶ 39. AMEC asserts that, following the termination of SolSource's subcontract, it incurred approximately $75,000 in additional costs to correct the PV array's structural and engineering deficiencies. *Id*. at ¶ 40.

### B. Electrical Systems Installation

To complete the electrical systems for the PV array, SolSource contracted with Aerotek Energy Services, Inc., Intermountain Electric, Inc., CED, Inc., and Advanced Energy Industries, Inc. Docket No. 1 at 8, ¶ 42. In June 2010, AMEC paid an invoice from SolSource for approximately $292,000 for the installation of the electrical systems. *Id*. at ¶ 43. According to AMEC, as of September 20, 2010, SolSource had completed only 60% of the work required for the installation of the electrical systems. *Id*. at ¶ 44.

AMEC alleges that after the termination of the subcontract on September 20, 2010, it incurred $250,000 in additional costs to complete the installation of electrical components. *Id*. at ¶ 45. Additionally, AMEC paid $200,000 to repair newly discovered deficiencies with the electrical system, *id*. at ¶¶ 46-48, and incurred $75,000 in costs to

repair damage from a fire started because SolSource allegedly installed electrical components improperly. *Id*. at 10, ¶ 52.

### C. Lower Tier Subcontractors

On August 24, 2010, AMEC received a notice pursuant to the Miller Act, 40 U.S.C. § 3133, from D&B Drilling demanding payment in the amount of $267,553.87. Docket No. 1 at 11, ¶ 57. D&B Drilling sought payment from AMEC for work performed on the PV array because SolSource failed to fully compensate D&B Drilling for its labor and materials. *Id*. After receipt of D&B Drilling's notice, AMEC sent SolSource several cure notices directing SolSource to pay its lower tier subcontractors. *Id*. at ¶¶ 58-59. AMEC contends that SolSource failed to pay D&B Drilling approximately $167,553.87, Advanced Piping $86,314.82, and AZ-Tec $20,000. *Id*. at 11-12, ¶¶ 62-64.

### D. Defendants' Motion to Dismiss

On January 20, 2011, AMEC filed a complaint [Docket No. 1] bringing claims against defendants SolSource and Mr. Scott for: (1) breach of contract; (2) negligence; (3) indemnification; (4) breach of fiduciary duty because of non-compliance with the Colorado Mechanics' Lien Trust Fund Statute, Colo. Rev. Stat. § 38-22-127; and (5) civil theft. Docket No. 1 at 14-18. AMEC alleges that Mr. Scott, as president of SolSource, is personally liable for damages under claims four and five because of his non-compliance with the Trust Fund Statute. *Id*.

On April 14, 2011, defendants filed a motion to dismiss [Docket No. 33]. Mr. Scott requests that the Court dismiss AMEC's fourth and fifth claims for relief and dismiss him as an individual defendant because AMEC lacks standing to sue under the

Trust Fund Statute.  Docket No. 33 at 5.  Mr. Scott alleges that AMEC lacks standing to assert claims for relief under the Trust Fund Statute because the statute does not consider general contractors direct beneficiaries.  Docket No. 33 at 2.  He also asserts that to include general contractors within the scope of the statute's protection would be an overly broad reading of the statute.  Docket No. 33 at 2.  Furthermore, Mr. Scott claims that the Court need not assert jurisdiction under the Trust Fund Statute because it is a duplicative claim, as plaintiff's interests are adequately protected through its indemnification and breach of contract claims.  *Id.* at 3.

Additionally, SolSource requests that the Court dismiss AMEC's second claim for negligence because plaintiff's claim is barred by the economic loss rule.  *Id*.  However, given that default has entered against SolSource [Docket No. 47], the Court will only address AMEC's fourth and fifth claims for relief and will not consider the motion to dismiss as it relates to the second claim against SolSource.  The Court finds that consideration of the economic loss rule is better suited for AMEC's pending Motion for Default Judgment [Docket No. 48] against SolSource.

## II.  STANDARD OF REVIEW

The motion to dismiss does not cite the rule under which it is brought.  The Court finds that, based on arguments contained therein, the motion invokes Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Dismissal pursuant to Rule 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint.  Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by

presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). When resolving a facial attack on the allegations of subject matter jurisdiction, the Court "must accept the allegations in the complaint as true." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir.1995). To the extent the defendant attacks the factual basis for subject matter jurisdiction, the Court "may not presume the truthfulness of the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *SK Finance SA v. La Plata Cnty.*, 126 F.3d 1272, 1275 (10th Cir. 1997). "Reference to evidence outside the pleadings does not convert the motion to dismiss into a motion for summary judgment in such circumstances." *Id.* Ultimately, and in either case, plaintiff has "[t]he burden of establishing subject matter jurisdiction" because it is "the party asserting jurisdiction." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

Under Rule 12(b)(6), the "court's function . . . is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's Complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted). In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks and citation omitted). "In addition to the complaint, the district court may consider documents referred to in the

complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). A court, however, need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (omission marks, internal quotation marks, and citation omitted). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009) (internal quotation marks and alteration marks omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (quotation marks and citation omitted).

### III. ANALYSIS

The Colorado Mechanics' Lien Trust Fund Statute provides, in pertinent part, that:

> All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall

> be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

Colo. Rev. Stat. § 38-22-127(1). The language of the statute implies that, when a property owner pays a contractor, the contractor receives the money in trust for the payment of subcontractors and suppliers. *Flooring Design Assocs., Inc. v. Novick*, 923 P.2d 216, 221 (Colo. App. 1995). While the Trust Fund Statute expressly provides that a contractor must hold all funds in trust for the benefit of subcontractors, laborers, and material suppliers, the statute does not specify who is authorized to enforce the statutory trust, or the mechanism by which it is to be enforced.

Mr. Scott asserts that Colorado's Trust Fund Statute only provides a right of action to "subcontractors, laborers, material suppliers" or to owners of construction projects. Docket No. 33 at 3. Mr. Scott also claims that the primary purpose of the Trust Fund Statute is to protect property owners against unscrupulous general contractors, not to create a legally protected right for general contractors. Docket No. 31 at 2. Moreover, Mr. Scott argues that *In re Walker*, 325 B.R. 598, 604 (D. Colo. 2005), did not extend protection of the Trust Fund Statute to general contractors; rather, *In re Walker* stands for the proposition that a subcontractor's debt to an owner and general contractor is not dischargeable in bankruptcy. *Id*. at 3. Accordingly, Mr. Scott claims that, because AMEC is a general contractor, it is not a beneficiary under the Trust Fund Statute and does not have standing to sue. *Id*.

In response, AMEC argues that the purpose of the Trust Fund Statute was two-fold: (1) to protect subcontractors from unscrupulous general contractors; and (2) to prevent a broad class of beneficiaries from making double payments because of a general contractor's (or subcontractor's) behavior. Docket No. 18 at 5. AMEC contends that, because of the broad remedial purpose of the Trust Fund Statute, the statute should be read to include general contractors who face the possibility of making double payments. *Id*. AMEC asserts that the extension of protection to a general contractor is warranted in this case because AMEC faces the possibility of compensating SolSource's subcontractors despite making timely invoice payments. *Id*. AMEC also alleges that Mr. Scott is liable under the Trust Fund Statute because the statute makes a natural person in control of an entity personally liable if he or she controls the entity's finances and decisionmaking.

The Colorado General Assembly's purpose and intent behind the Trust Fund Statute was "to protect homeowners, laborers and providers of construction materials from dishonest or profligate contractors." *A.C. Excavating, Inc. v. Yale*, ---P.3d---, 2010 WL 3432219, at *2 (Colo. App. Sept. 2, 2010) (citation omitted). To meet this purpose, the statute imposed duties on contractors to ensure that subcontractors were paid for their contributions. *Id*. Consistent with this view, Colorado courts have held that, on any project where a subcontractor is unpaid, to avoid a Trust Fund Statute violation contractors must pay all money received on the project to subcontractors before using the money for any other purpose. *See In re Siegfried*, 5 F. App'x 856, 861 (10th Cir. 2001) (finding that a contractor is responsible for paying subcontractors and meeting its

own expense from the funds disbursed and the insufficiency of funds to meet a general contractor's expenses is not a defense to liability under the Trust Fund Statute).

In this case, AMEC relies on cases finding that the Trust Fund Statute provides standing to a broad class of claimants to support its argument that it has standing. *See Syfrett v. Pullen*, 209 P.3d 1167, 1170 (Colo. App. 2008) (homeowner had standing to sue under the statute because the homeowner was a principal beneficiary of the statutory trust); *In re Walker*, 325 B.R. 598, 604 (D. Colo. 2005) (owner and a general contractor have standing under the statute); *In re Brennan*, 449 B.R. 114, 118 (Bankr. D. Colo. 2011) (general contractor has standing to sue subcontractor under the statute); *In re Regan I*, 151 P.3d 1281, 1285-86 (Colo. 2007) (subcontractor need not perfect lien on property to have standing under the Trust Fund Statute). Specifically, AMEC relies on rulings from bankruptcy proceedings wherein courts have noted the possibility that the Trust Fund Statute provides a protected legal interest for general contractors. *See In re Brennan*, 449 B.R. at 118.

AMEC's reliance on bankruptcy rulings, however, is misplaced. The bankruptcy cases cited by AMEC hold that general contractors have standing under 11 U.S.C. § 523(a)(4) to challenge the dischargeability of a debt in bankruptcy. Under bankruptcy law, 11 U.S.C. § 523(a)(4) requires a plaintiff challenging the dischargeability of a debt in bankruptcy to show: (1) that a fiduciary relationship existed between plaintiff and defendant; and (2) the defendant's debt was attributable to defendant's fraud or defalcation. *In re Siegfried*, 5 F. App'x 856, 859 (10th Cir. 2001). To satisfy the first element, bankruptcy courts have found that the Trust Fund Statute creates a fiduciary

relationship under § 523(a)(4) between general contractors and subcontractors. *Id*. In addition, bankruptcy courts define defalcation as a "fiduciary-debtor's failure to account for funds that have been entrusted to it due to any breach of fiduciary duty." *In re Regan II*, 04-cv-01483-LTB, 2007 WL 1346576, at *2 (D. Colo. May 4, 2007). Thus, bankruptcy courts have found that a failure to compensate subcontractors for their work usually satisfies the definition of defalcation. *Id*.

Given this background, the bankruptcy cases stand for the proposition that general contractors have standing to challenge the dischargeability of a debt, not because of a protected right created by the Trust Fund Statute, but rather because the Trust Fund Statute creates a fiduciary duty on general contractors vis-a-vis subcontractors that satisfies one of the elements of 11 U.S.C. § 523(a)(4). Additionally, the holdings from the bankruptcy courts do not state that a plaintiff has a right to effective relief under the Trust Fund Statute; on the contrary, they merely hold that a defendant's debt is nondischargeable.

Accordingly, because the Trust Fund Statute does not create a legal right for general contractors to pursue claims against subcontractors, the Court finds that AMEC does not have standing to sue SolSource or Mr. Scott under the statute. Therefore, AMEC's fourth and fifth claims for breach of fiduciary duty are dismissed and the Court also dismisses Mr. Scott as a defendant because these are the only two claims asserted against him.

## IV. CONCLUSION

Accordingly, it is

**ORDERED** that Defendants' Amended Motion to Dismiss AMEC's Second, Fourth, and Fifth Claims for Relief [Docket No. 33] is **GRANTED** in part and **DENIED** in part as indicated in this Order. It is further

**ORDERED** that Defendants' Motion to Dismiss AMEC's Second, Fourth Claims for Relief [Docket No. 13] is **DENIED** as moot.

DATED February 22, 2012.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge
